FOURTH DIVISION
FEBRUARY 8, 2007

No. 1-05-1903

| | | |
|---|---|---|
| PIERRE PETRICH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| MCY MUSIC WORLD, INC., a Delaware Corporation; SFX ENTERTAINMENT GROUP, INC., a Delaware Corporation; SFX MARKETING, INC., a Delaware Corporation; SFX TOURING, INC., a Delaware Corporation; ROUTE 66 RACEWAY, LLC; SKEEZ, LLC, f/s/o *NSYNC; and J.C. CHASEZ, LANCE BASS, CHRIS KIRKPATRICK, JUSTIN TIMBERLAKE and JOEY FATONE, p/k/a *NSYNC; and ZEEKS, INC., a Delaware Corporation, | ) ) ) ) ) ) ) ) ) ) ) ) | Honorable |
| Defendants-Appellees. | ) ) | Michael T. Healy, Judge Presiding. |

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff, Pierre Petrich, appeals from multiple orders of the circuit court of Cook County denying class certification of her complaint for consumer fraud, negligence and breach of contract against defendants, various music promoters, a music venue and the pop band "*NSYNC." Plaintiff alleged that defendants, MCY Music World, Inc. (a music distribution company); SFX Entertainment Group, Inc., and its affiliates[1] (promoters and marketers of the *NSYNC tour); Route 66 Raceway LLC (the concert venue); SKEEZ, LLC (*NSYNC's live show producer);

---

[1]Affiliates include: SFX Marketing, Inc, and SFX Touring, Inc.

ZEEKS, Inc. (owner of the trademark "*NSYNC" and employer of the band members); the band *NSYNC and its individual band members, J.C. Chasez, Lance Bass, Chris Kirkpatrick, Justin Timberlake, and Joey Fatone, breached their contractual duty to ensure her timely arrival to the Route 66 Raceway concert venue and sought damages on behalf of herself and for a class of "all ticket-holders" of an *NSYNC concert performed on August 1, 2000.

On appeal, plaintiff contends that: (1) the trial court erred in failing to certify a class of concertgoer-plaintiffs who plaintiff alleges were denied reasonable access to the *NSYNC concert when defendants breached the contractual terms of the concert tickets; (2) the trial court erred in dismissing plaintiff's consumer fraud claim; (3) the trial court erred in dismissing the individual *NSYNC defendants from the case; and (4) the trial court erred in failing to enforce the terms of plaintiff's settlement agreement with defendants. For the following reasons, we affirm the judgment of the trial court.

BACKGROUND

The record reveals the following relevant facts. David S. Petrich purchased four twelfth-row center tickets for the August 1, 2000, concert of the pop band *NSYNC, at the Route 66 Raceway in Joliet, Illinois, from Gold Coast Tickets, Ltd., a ticket broker, and gave them to his wife, plaintiff, Pierre Petrich. Plaintiff took the tickets for herself, her daughter, her niece, and her daughter's friend and drove her guests to the concert, starting out from her home in Northbrook and stopping first for dinner at her sister's home in Naperville. Plaintiff then took directions from her sister for the drive from Naperville to Route 66 Raceway in Joliet, and left Naperville at 6 p.m. relying on her sister's 25- to 30-minute estimate of the driving time. Plaintiff encountered heavy

traffic and difficulty parking; plaintiff parked at approximately 9:45 p.m and she and her party missed a significant portion of the concert.

On August 4, 2000, plaintiff filed a lawsuit alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 (West 2004)) (Consumer Fraud Act), breach of contract and negligence, and seeking to certify a class of all ticket holders. Plaintiff alleged damages on behalf of "hundreds, if not thousands" of ticket holders who missed "most or all" of the *NSYNC concert as a result of congested traffic on the roadway leading into the Route 66 Raceway and inadequate parking facilities on the premises. Plaintiff alleged that: (1) Route 66 Raceway lacked the traffic control to accommodate a crowd of 48,000 ticket holders; (2) roads leading to the concert were "impassable for miles"; (3) plaintiff and other ticket holders "were aware of only one major artery in and out of the venue," *i.e.*, Illinois Route 53; and (4) Route 66 Raceway advised patrons to use Route 53 on its website.

The individual defendants filed appearances contesting personal jurisdiction and the remaining defendants filed motions to dismiss plaintiff's complaint. On July 10, 2001, plaintiff filed a third amended complaint in three counts.

In December 2001 and again in January 2002, the trial court, Judge Lester Foreman presiding, dismissed plaintiff's class action as legally insufficient. Judge Foreman also twice dismissed plaintiff's consumer fraud claim for failure to state a claim for relief. Judge Foreman allowed to stand, however, plaintiff's claim for "breach of license," ruling that an implied contract existed by way of defendants' inclusion of a $3 parking charge on each ticket which in turn created a contractual obligation that defendants communicate parking access problems to each ticket purchaser.

Following Judge Foreman's death, plaintiff's case was assigned to Judge Deborah Dooling. On December 2, 2003, Judge Dooling denied plaintiff's motion for class certification, holding that class certification was improper where no common questions of fact predominated:

"[T]he circumstances surrounding each plaintiff's purchase of tickets, their attempts to acquire travel or parking information, and the time they arrived at the concert is unique. This Court could not answer all these questions of fact without examining each individual plaintiff's individual circumstances."

Judge Dooling further held that no common questions of law predominated because damages and privity of contract are individual questions, and that plaintiff was not an adequate class representative because she did not purchase her own tickets and lacked privity of contract with any defendant.

On January 2, 2004, plaintiff filed a motion to reconsider Judge Dooling's denial of class certification. On April 24, 2004, Judge Dooling held a pretrial settlement conference. Plaintiff proposed two settlement classes: one comprised of concertgoers who wrote letters to the promoters or to newspapers complaining that they missed part or all of the concert because they were stuck in a traffic jam and another class comprised of people who did not write to complain but similarly missed portions or all of the concert. Plaintiff proposed that some *NSYNC- related item be awarded to this class on a "claims made basis," and that this group would receive notice only by publication. Defendants rejected plaintiff's proposal.

On May 7, 2004, defendants' counsel offered to pay plaintiff a total of $40,000 to a class of plaintiffs defined as "those individuals who wrote letters of complaint about the concert," and

provided that the offer would expire on May 12, 2004. Plaintiff did not accept the offer and the offer expired.

Meanwhile, Judge Donnersberger took over Judge Dooling's call in the trial court. On May 9, 2004, Judge Donnersberger upheld Judge Dooling's ruling denying class certification.

On May 14, 2003, at 9 a.m., prior to a 10 a.m. scheduled court appearance, the parties again commenced settlement negotiations. Plaintiff's counsel proposed a settlement amount of $45,000 on behalf of the subclass of concertgoers who wrote complaint letters. Defendants' counsel responded that defendants would settle for $45,000, in exchange for a written release from all "those who claim to have been late or to have missed any part of the concert *and* of individuals who wrote letters of complaint about the concert." (Emphasis in original). Defendants' final settlement offer was $45,000 and required written confirmation of agreement by 10 a.m. on May 14, 2004. Plaintiff's counsel responded to this offer stating that he would only settle on behalf of the smaller subclass. No agreement was ever reached between the parties as to the definition of the settlement class and the parties did not enter into a settlement agreement.

On August 18, 2004, Judge Donnersberger heard arguments on plaintiff's motion to enforce the settlement agreement and for Rule 304(a) (210 Ill.2d R. 304(a)) language, as well as defendant's motion to transfer plaintiff's individual case to small claims court. Judge Donnersberger denied plaintiff's motion to enforce any purported settlement agreement, finding that there was no settlement agreement. Judge Donnersberger further denied defendants' motion to transfer plaintiff's case to small claims court, instead ordering plaintiff's case transferred to Judge Kinnard, presiding

judge of the chancery division, for transfer to the first municipal division, finding "no equitable matters on relief for plaintiff's case."[2]

On September 10, 2004, Judge Kinnard assigned plaintiff's case to Judge Kenneth Wright, presiding judge of the first municipal division.[3] On October 18, 2004, plaintiff filed a motion for reconsideration of the transfer to the municipal division. Defendants filed a motion in opposition. The motion was assigned to Judge Michael T. Healy of the first municipal division for a hearing on November 10, 2004. On that date, Judge Healy entered an order closing discovery and assigning plaintiff's case to mandatory arbitration.[4]

On March 18, 2005, following nonbinding arbitration, a panel of arbitrators awarded plaintiff $233, the face value of the four concert tickets. Judge Healy entered final judgment on the award in favor of plaintiff on May 9, 2005, and denied plaintiff's request for attorney fees.

On June 7, 2005, plaintiff filed a notice of appeal of the following six orders of the circuit court: (1) the two orders entered by Judge Foreman dated December 12, 2001, and December 14, 2001, granting defendants' motions to dismiss plaintiff's consumer fraud count; (2) the order entered by Judge Foreman on January 18, 2002, granting defendants' Chasez, Bass, Kirkpatrick,

---

[2] The first municipal division hears civil suits for damages up to $30,000. Cook Co. Cir. Ct. G.O. 2.1(a)(1)(i) (eff. June 12, 1998).

[3] The case was not renumbered as a municipal case, but, rather, retained the chancery division case number designation.

[4] A civil action is subject to mandatory arbitration in the circuit court of Cook County if the suit alleges money damages not to exceed $30,000. 155 Ill.2d R. 86 (b); Cook Co. Cir. Ct. R. 18.3(c) (eff. August 1, 2001).

Timberlake and Fatone's motion to quash and dismiss; (3) the order entered by Judge Dooling on December 2, 2003, denying plaintiff's amended motion for class certification; (4) Judge Donnersberger's memorandum and order of May 9, 2004, denying plaintiff's motion to reconsider her amended motion for class certification; and (5) Judge Donnersberger's order of August 18, 2004, denying plaintiff's motion to enforce a purported settlement agreement.

OPINION

Initially, plaintiff contends that the trial court erred by failing to grant class certification of "all holders of tickets to the performance of *NSYNC scheduled for August 1, 2000, at 7:30 p.m., at Route 66 Raceway in Joliet, Illinois," arguing that Judge Dooling "misunderstood and misapplied the law on class certification." Class certification is entirely within the province of the trial court and its determination will not be disturbed absent a clear abuse of discretion or the application of "impermissible legal criteria." P.J.'s Concrete Pumping Service, Inc. v. Nextel West Corp., 345 Ill. App. 3d 992, 1002, 803 N.E.2d 1020 (2004); Key v. Jewel Cos., 176 Ill. App. 3d 91, 95, 530 N.E.2d 1061 (1988).

To certify a class action, the trial court must find that all of the following factors are met: (1) numerosity, *i.e.*, the class is so numerous that joining all members is impracticable; (2) commonality, *i.e.*, there are questions of fact or law common to the class, and the common questions predominate over any questions affecting only individual members; (3) the representative parties will fairly and adequately protect the interests of the class; and (4) the class action is an appropriate method for fairly and efficiently adjudicating the controversy. 735 ILCS 5/2-801 (West 2000); Avery v. State Farm Mutual Automobile Insurance Co., 216 Ill.2d 100, 125, 835 N.E.2d 801 (2005).

Plaintiff argues that "numerosity" is demonstrated by the 104 complaint letters that represented the situation of 200 to 400 ticket holders. See, *e.g.*, Scholes v. Stone, McGuire & Benjamin, 143 F.R.D. 181 (N.D. Ill. 1992) (federal district court certified a class of 129 plaintiffs victimized by a fraudulent investment scheme under Federal Rule of Civil Procedure 23(a) (Fed. R. Civ. P. 23(a)), which has parallel requirements to Rule 801). The trial court found that plaintiff did, in fact, demonstrate numerosity, but failed to meet the other criteria required for class certification.

Plaintiff initially disputes the trial court's finding that no common questions of fact or law predominate. Plaintiff argues that the concertgoers' complaint letters, and the descriptions contained therein of the traffic jam and lack of parking, demonstrate the commonality that defendants "did not provide access to the venue for hundreds of cars full of people regardless of what time they left."

In support, plaintiff cites Gordon v. Boden, 224 Ill. App. 3d 195, 586 N.E.2d 461 (1991). There, the defendants pled guilty to a multicount federal indictment in connection with selling adulterated frozen orange juice to grocery stores. The defendants were sentenced to prison terms and required to pay fines and perform community service. On the heels of the defendants' convictions, the plaintiffs filed a class-action complaint on behalf of each consumer who purchased adulterated orange juice. The defendants argued that common questions of *fact* could not be established because each class member's purchase of an adulterated orange juice product involved a unique set of circumstances, such as the exact item purchased and the particular retail grocery store where the item was purchased. This court held, however, that the commonality test "is couched in the disjunctive - - 'common questions of fact *or* law.'" It does not, therefore, require the presence of both a common question of fact and a common question of law." (Emphasis in original.)

Gordon, 224 Ill. App. 3d at 200, quoting Miner v. Gillette Co., 87 Ill.2d 7, 17, 428 N.E.2d 478 (1981). This court concluded that commonality was met because of the existence of at least one question of law common to the class: "whether defendant adulterated its orange juice products and committed the other fraudulent acts as alleged." Gordon, 224 Ill. App. 3d at 201.

Gordon is distinguishable from the present case, as no common questions of fact or law predominate over the issues of individual members in the present case. Initially, the fact that all concertgoers held a ticket is not enough to constitute predominance, particularly in a breach of contract action. See, *e.g.*, Arca v. Colonial Bank & Trust Co., 265 Ill. App. 3d 498, 637 N.E.2d 687 (1994). There, this court refused to certify a class of plaintiffs who entered into motor vehicle sales installment contracts over a three-year period with defendants, a car dealership and a bank, finding that all such persons were not obligated under legally unenforceable contracts and that each person's situation was distinct: "Of the utmost relevance in determining the extent of one's liability is the examination of the particular facts surrounding each individual situation and set of circumstances." Arca, 265 Ill. App. 3d at 501.

Similarly, in Key v. Jewel Cos, this court refused to certify a class of "all franchisees" of White Hen Pantry stores whose franchises were terminated, holding:

> "[T]hese are not common questions but rather individual
>
> questions the resolution of which turns on specific facts as to the
>
> relationship between individual franchisees and White Hen Pantry
>
> and the manner in which individual franchisees operated their stores.
>
> *** There is no evidence to suggest that the experience of the
>
> plaintiffs, who were involuntarily terminated franchisees, is in any

9

way representative of a class that would include all franchisees."

Key, 176 Ill. App. 3d at 97.

In examining whether any common questions existed, the trial court distinguished the present case from Miner v. Gilette Co., 87 Ill. 2d 7, 428 N.E.2d 478 (1981). There, the Gillette Company conducted a promotion offering to supply a free accent table lighter to persons remitting proof of purchase of two "cricket" disposable butane lighters, along with 50 cents for postage and handling. The response to the offer exceeded Gillette's expectations, however, and Gillette was unable to fill approximately 180,000 requests for the promotional lighter. Consequently, Gillette mailed a letter to each of the 180,000 persons requesting the promotion stating that the supply of accent lighters was exhausted, apologizing for the inconvenience, and returning the 50-cent postage-and-handling fee to each applicant, together with a free "cricket" lighter. Miner, 87 Ill. 2d at 11.

Subsequently, the plaintiff filed a class-action complaint on behalf of a nationwide class of consumers against the Gillette Company in connection with the promotion of its "cricket" lighters, alleging consumer fraud violations. Our supreme court held that the plaintiff could bring a class action on behalf of Illinois residents based on the facts that:

> "[T]he present case is predicated upon a series of essentially
> identical transactions by thousands of purchasers including Illinois
> residents, which were founded upon and arose out of identical
> language in the promotional offer prepared by defendant. Unlike in
> the class of nonresidents, *the Illinois class also has a common*
> *question of law, that is, the law of Illinois, so that there is no*

*possibility that different questions of law will predominate.*"

(Emphasis added.) <u>Miner</u>, 87 Ill. 2d at 19.

The trial court here found that, unlike <u>Gillette</u>, "[t]his is not a situation that is predicated on a series of identical transactions by thousands of purchasers." The trial court determined that each class member would have to prove that: (1) the ticketholder was late to the concert; (2) defendants provided the ticketholder with inadequate warnings regarding foreseeable traffic and parking delays; and (3) the ticketholder's lateness resulted from defendants' inadequate warnings and not a misstep by the ticket holder. The trial court concluded that the questions of contract damages and privity were too individualized to support a finding of commonality, holding:

> "Plaintiff would still have to prove how Defendants caused her
> damage. An examination of this element of Plaintiff's claim would
> once again require this Court to examine each plaintiff's individual
> claim. Why each plaintiff arrived at the concert late or missed the
> concert is an individual consideration. Whether a plaintiff was late or
> missed the concert because they failed to avail themselves of
> Defendants' travel and access information, or because of a plaintiff's
> own negligence or even if the lateness was a combination of the two
> events, is a determination that would have to be decided on a plaintiff
> by plaintiff basis."

Plaintiff provides no evidence identifying any common questions of law. Plaintiff fails to explain how the damages claimed by a ticketholder who missed a few minutes of the show would be

11

identical to the damages claimed by a ticketholder who missed half or all of the show. Because individual questions predominate, the trial court properly denied class certification.

Plaintiff's further contention that she is an adequate class representative fails for several reasons, including: (1) the circumstances of plaintiff's travel arrangements and method of travel to the concert venue were distinct from the proposed class; (2) plaintiff did not purchase her own tickets and therefore lacked privity of contract with any defendant; and (3) plaintiff's claims were fully resolved via mandatory arbitration. In Avery, the Illinois Supreme Court held that "[t]he purpose of the adequate-representation requirement is to ensure that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim." Avery, 321 Ill. App. 3d at 285, 746 N.E.2d at 1257.

Here, the trial court found that "different operative facts will control the outcome of each individual plaintiff's case," and therefore plaintiff could not "adequately represent the individual interests" of a proposed class. The record shows that while plaintiff proposed a class of "all ticketholders," at her deposition she testified that her class would be limited to: "the people who did not make it into the concert or who did make it in and only saw 15 or 20 minutes of it. Who did not see the concert in its entirety." Further, the record reveals that plaintiff did not consult with defendants for traffic information, driving directions, or parking details, but instead relied upon her sister for her travel route from Naperville to Joliet. Finally, plaintiff received an award for the full price of her tickets and therefore no longer has standing to be the representative of a putative class. Wheatley v. Board of Education, 99 Ill. 2d 481, 486-87, 459 N.E.2d 1364 (1984) (terminated teachers who were named plaintiffs accepted re-employment and were no longer proper class representatives).

12

Next, plaintiff contends that her claim for breach of contract should continue and that Judge Foreman correctly allowed it to remain standing at the time of dismissal of plaintiff's other claims.

Defendants respond that plaintiff merges her argument for class certification with an argument for breach of contract and point out that Judge Foreman's failure to dismiss plaintiff's breach of contract claim was contrary to a well-developed existing body of law regarding the ticket wording: "This ticket is a revocable license." A ticket to a concert creates only a limited property right--a revocable license--to enter the land of another for a limited purpose. See, *e.g.*, Soderholm v. Chicago National League Ball Club, Inc., 225 Ill. App. 3d 119, 124-25, 587 N.E.2d 517 (1992). We agree that a ticket does not create implied guarantees of timely arrival or appropriate parking.

Plaintiff further argues that because she won an award in arbitration on the merits and defendants did not appeal that award, defendants' "re-argument" of the merits of her breach of contract claim is barred by waiver, election and estoppel. Liebovich Steel & Aluminum Co. v. Advance Iron Works, Inc., 353 Ill. App. 3d 311, 818 N.E.2d 895 (2004). Plaintiff's argument is without merit. Plaintiff's breach of contract claim was extinguished by entry of a judgment on her arbitration award and defendants were under no obligation to appeal the award.[5]

---

[5]Arguing from a policy standpoint, defendants respond that if a concert ticket constitutes a contract for parking, then The Chicago Bears and O'Hare Airport could be liable for damages on big game days and holiday weekends when parking is a "hot commodity." Plaintiffs reply by warning this court that she and the asserted class of concert-goers narrowly avoided writing the next chapter in the "sad history of rock and roll shows" by comparing her long trek through the mud to another "Altamont." In addition, plaintiff portrays this particular *NYSNC show as a "Beatlemania" moment, comparing this concert at the Route 66 Raceway to "the situation where

(continued...)

13

Next, plaintiff contends that the trial court erred in dismissing her consumer fraud claim. Plaintiff argues that the sale of a ticket is accompanied by an "implied warranty of reasonable access" which was breached by defendants through misrepresentation and omission regarding access to the venue and parking at the venue. Our review of the determination regarding a question of law is *de novo*. Sklodowski v. Countrywide Home Loans, Inc., 358 Ill. App. 3d 696, 703, 832 N.E.2d 189, 195-96 2005).

Under the Consumer Fraud Act, in order to state a claim a plaintiff must allege: " '(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception.'" Avery, 216 Ill.2d at 190-91, 835 N.E.2d at 856, quoting Oliveira v. Amoco Oil Co., 201 Ill. 2d 134, 149, 776 N.E.2d 151, 160 (2002); see also 815 ILCS 505/1 *et seq.* (West 2000). An action under the Consumer Fraud Act must be pled with specificity: "[T]he complaint must state with particularity and specificity the deceptive manner of defendant's acts or practices." Sklodowski, 358 Ill. App. 3d at 703, 832 N.E.2d at 196.

In her complaint, plaintiff alleged that defendants made "misrepresentations" relating to the accessibility, venue capacity, parking facilities and traffic control measures at the Route 66 Raceway. Plaintiff alleged consumer fraud as follows:

---

[5](...continued)
the Beatles played at Wrigley Field." Not only do we decline to set policy based on the parties' hyperbolic hypothetical arguments, but we take judicial notice that the Beatles played Comiskey Park on August 20, 1965, not Wrigley Field. See, L. Kane, Ticket to Ride: Inside the Beatles' 1964 & 1965 Tours That Changed the World (2004).

14

"Representing that tickets to the Performance conferred the bearer with the right of admission to the concert venue, despite Defendant's knowledge that access to the venue by all ticket-holders would be virtually impossible; and

Representing that the venue capacity, available parking facilities, traffic control measures, and road access were sufficient to allow admission of all ticket-holders, including but not limited to adequate parking facilities and means of ingress and egress to the venue."

Plaintiff alleges that the concert venue was designed to hold 30,000 people, yet almost 48,000 tickets to the event were sold. Plaintiff argues that defendants' failure to disclose facts regarding the venue, surrounding roads, parking facilities and the excessive number of tickets sold constitutes material misrepresentations.

Plaintiff further asserts that defendants intended plaintiff and other ticket holders to rely on their misrepresentations. Plaintiff argues that having sold almost 48,000 tickets to the show, defendants intended for plaintiffs and other ticket holders to believe that they would be able to see the show.

Plaintiff argues that defendants' "deceptive conduct" occurred in the course of trade or business; that she incurred actual damages, as determined in arbitration; and that defendants proximately caused the deception upon which she relied, *i.e.*, the deliberate over-selling of the concert.

Plaintiff's allegations fail to state with the required specificity what misrepresentations were made, by whom and to whom, when or how they were made. Thus, plaintiff's complaint fails to state a proper complaint for consumer fraud under the Act. See, *e.g.*, Board of Education v. A, C & S, Inc. 131 Ill. 2d 428, 457-58, 546 N.E.2d 580, (1989). Plaintiff attaches no exact time to the purported "fraudulent representations" made by defendants. If the representations occurred after plaintiff purchased her tickets, plaintiff's allegations cannot form the basis for a consumer fraud action. See Verb v. Motorola, Inc., 284 Ill. App. 3d 460, 472, 672 N.E.2d 1287 (1996).

Moreover, notwithstanding plaintiff's allegations of "deception," the Uniform Deceptive Trade Practices Act is not applicable to plaintiff's complaint. 815 ILCS 510/1 *et seq.* (West 2000). Section 2(5) prohibits representing "that goods or services have sponsorship, approval, characteristic, ingredients, uses, benefits or quantities that they do not have." 815 ILCS 510/2(5) (West 2000). Plaintiff's complaint fails to allege any specific misrepresentations under the statutory language of the Deceptive Trade Practices Act.

Plaintiff further contends that the trial court erred in dismissing the individual *NSYNC defendants. Plaintiff explains that the two corporations, ZEEKS and SKEEZ are actually acronyms for the defendant band members, who are the sole shareholders, principals and employees of the corporations they claim to be their employers. Plaintiff argues that these corporations are designed to shield defendants from liability and that there is nothing to put concert goers "on notice" that they are dealing with anyone but the *NSYNC performers. Plaintiff urges this court to "pierce the corporate veil" and that long-arm jurisdiction is appropriate in this case pursuant to section 2-209(a) of the Code of Civil Procedure. 735 ILCS 5/2-209(a) (West 2000).

Defendants respond that no long-arm jurisdiction exists over the individual defendants because (1) ZEEKS is not a sham corporation[6] and its corporate veil cannot be pierced; (2) jurisdiction over ZEEKS does not establish jurisdiction over ZEEKS' shareholders or employees; (3) plaintiff's claims do not "arise out of" any acts taken by the individual defendants; and (4) the fiduciary shield doctrine precludes personal jurisdiction over the individual defendants.

Defendants point out that ZEEKS and SKEEZ are Delaware corporations and that under Delaware law, the corporate veil may be pierced only "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved." Pauley Petroleum Inc. v. Continental Oil. Co.. 43 Del. Ch. 516, 521, 239 A.2d 629, 633 (1968); Retzler v. Pratt & Whitney Co., 309 Ill. App. 3d 906, 723 N.E.2d 345 (1999). Delaware law requires an element of fraud to pierce the corporate veil. Factors showing fraud include: undercapitalization, lack of solvency, proper payment of dividends, observance of corporate formalities, and improper shareholder activity. See Mason v. Network of Wilmington, Inc., No. Civ. A 19434 - NC (Del. Ch. July 1, 2005), quoting Wallace ex rel. Cencom Cable Income Partners II , Inc. L.P. v. Wood, 752 A.2d 1175, 1184 (Del. Ch. 1999).

Plaintiff fails to show that either ZEEKS or SKEEZ is a sham corporation engaged in fraud as described above. Plaintiff has failed to show that personal jurisdiction is proper over the individual stockholders or employees of either ZEEKS or SKEEZ or both: "The mere fact that a corporation by which a nonresident is employed, or in which he is a stockholder is itself subject to

---

[6] SKEEZ is not a "sham corporation" either, but plaintiff drops SKEEZ from her argument and merely discusses ZEEKS throughout her brief.

Illinois jurisdiction does not subject that nonresident to jurisdiction." <u>Mergenthaler Linotype Co. v. Leonard Storch Enterprises, Inc.</u>, 66 Ill. App. 3d 789, 797, 383 N.E.2d 1379, 1385 (1978).

Section 2-209(f) requires that claims "arise from" a transaction to "ensure that there is a close relationship between a cause of action against a nonresident defendant and its jurisdictional activities." <u>Alderson v. Southern Co</u>, 321 Ill. App. 3d 832, 847, 747 N.E.2d 926, 939 (2001); 735 ILCS 5/2-209(f) (West 2000). The record shows that the band member defendants did not transact the specific business about which plaintiff complains, *i.e.*, the selling of tickets--they merely appeared to perform a concert. Thus plaintiff's claims do not "arise out of " the band members' activities.

Finally, the fiduciary shield does preclude jurisdiction, contrary to plaintiff's argument. The fiduciary shield doctrine precludes exercising personal jurisdiction over the individual defendants based on actions they took as employees or shareholders of ZEEKS/SKEEZ. No suit is permitted against "an individual who seeks the protection and benefits of Illinois law, not to serve his personal interests, but to serve those of his employer or principal." <u>Rollins v. Ellwood</u>, 141 Ill. 2d 244, 280, 565 N.E.2d 1302, 1318 (1990). The *NSYNC band members performed the concert as ZEEKS employees and the band members were paid by ZEEKS. The <u>Rollins</u> court held that asserting personal jurisdiction over an employee who acted in the scope of his employment is not justified merely by the fact that "the employee is serving his own financial interest when he performs the tasks imposed upon him by his employer." <u>Rollins</u>, 141 Ill. 2d at 280.

Plaintiff's final argument is that the trial court erred in refusing to enforce the terms of the purported settlement agreement. However, as detailed above, the facts indicate that no agreement was ever reached regarding the class or the settlement amount.

The definition of a settlement class must be precisely and accurately defined. Steinberg v. System Software Associates, Inc., 306 Ill. App. 3d 157, 167, 713 N.E.2d 709, 715-16 (1999). Here, the parties never agreed to the definition of the class.

In addition, a settlement agreement is a contract and governed by principles of contract law. M.H. Derrick Co. v. Century Indemnity Co., 299 Ill. App. 3d 620, 623, 701 N.E.2d 156, 159 (1998). Thus, a settlement agreement requires an offer, acceptance, and a meeting of the minds as to the terms. Magee v. Garreau, 332 Ill. App. 3d 1070, 1076, 774 N.E.2d 4441, 446 (2002). Where there is no agreement as to the terms, there is no binding agreement.

The record here shows that the parties never agreed to the terms of a settlement. Defendants made a settlement offer on May 7, 2004, in the amount of $40,000, with a specified time limitation that expired on May 12, 2004. Plaintiff failed to accept the offer on May 12, 2004, instead making a counteroffer. As plaintiff failed to accept the offer, the offer expired. New settlement negotiations began on May 14, 2004, but did not result in an agreement as the parties did not agree on the size of the class. The trial court properly refused to enforce an agreement that was nonexistent.

For the reasons stated herein, we affirm the judgment of the trial court.

Affirmed.

QUINN, P.J., and MURPHY, J., concur.